```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
BRUNO PIERRE,                                    :
                                                 :
                 Plaintiff,                      :
                                                 :         **MEMORANDUM AND ORDER**
        -against-                                :
                                                 :              14 Civ. 3790 (VMS)
                                                 :
HILTON ROSE HALL RESORT & SPA,                   :
HILTON RESORTS CORPORATION, ROSE                 :
HALL ASSOCIATES, LLC and ROSE HALL               :
OPERATING ASSOCIATES, LLC,                       :
                                                 :
                 Defendants.                     :
------------------------------------------------------------ X
```

**Vera M. Scanlon, United States Magistrate Judge:**

Plaintiff Bruno Pierre ("Plaintiff") filed this diversity action against Defendants Hilton Rose Hall Resort & Spa; Hilton Resorts Corporation; Rose Hall Associates, LLC; and Rose Hall Operating Associates, LLC (collectively, "Defendants") seeking damages for personal injuries that he allegedly sustained on August 9, 2013, while vacationing at a Jamaican resort that, at the time, was owned and operated by Defendants. See generally Amended Complaint, ECF No. 24-1. The parties have consented to my jurisdiction for all purposes. See ECF No. 10.

By Notice of Motion dated February 19, 2016, and in anticipation of the trial scheduled for April 2016, Defendants moved to preclude the testimony of Plaintiff's proposed liability expert, Matthew Diamond, under Federal Rule of Evidence ("Fed. R. Evid.") 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). For the reasons stated herein, Defendants' motion to preclude the testimony of Mr. Diamond is **granted**.

## I. BACKGROUND

### a. Factual Background

According to the Amended Complaint, on August 9, 2013, Plaintiff was a guest at Defendants' resort in Montego Bay, Jamaica. See Amended Complaint, ECF No. 24-1 ¶ 19. While using the resort's pool, Plaintiff slid down a waterslide and, upon entering the water, hit the bottom of the pool causing a severe fracture to his left foot. Id. ¶¶ 20-21; see also Plaintiff's Opposition, ECF No. 50, p. 1. The pool was three and a half feet deep at the waterslide terminus. See Plaintiff's Opposition, ECF No. 50, p. 1. Plaintiff alleges that either the pool and/or waterslide was defectively designed, thus causing his injuries. See Amended Complaint, ECF No. 24-1 ¶ 18.

### b. Procedural Background

In October 2015, the Court set a briefing schedule for Defendants' anticipated motion to preclude Plaintiff's expert witness ("Daubert motion"). See ECF No. 36. After the Court discussed scheduling with the parties during discovery, see 11/5/2015 & 11/17/2015 Orders, a trial date in April 2016 was scheduled, see 2/24/2016 Order. Defendants subsequently served their Daubert motion, Plaintiff opposed, and Defendants replied. The fully briefed Daubert motion was filed on March 11, 2016. See ECF Nos. 51-53.

The Court held oral argument on Defendants' Daubert motion. See 3/18/2016 Minute Entry. Defendants' Daubert motion was granted on the record, with this written decision to follow. See ECF No. 55.

### c. The "Expert" Opinion of Matthew Diamond

In order to establish his claim that his injury was caused by a pool and/or waterslide design defect, Plaintiff seeks to offer the testimony of a single liability expert, Mr. Diamond.

2

Although Plaintiff offers an expert report from Mr. Diamond, it is not entirely clear what Mr. Diamond's opinion is.

Mr. Diamond's report contains the following opinions:

> Thank you for calling me and inquiring about my service as an expert at trial regarding pool designs and safety rules. Your question to me: would I design a slide like this? [R]eferring to the photograph that's attached and my response [sic], "No. The water is too shallow from what I can see in the photo, and you wouldn't be able to put a cover on without modifications." . . . These recommendations also confirm my review of the visualization of the photograph attached that the drop off area is too shallow.

See Diamond Report ("Diamond Rep."), ECF No. 51-4, p. 5. The remainder of Mr. Diamond's report contains cites to various "Recommended Standards for Swimming Pool Design and Operation Policies for the Review and Approval Plans and Specifications for Public Pools" ("the Standards"), which appear to have been lifted word-for-word from a report generated by the "Great Lakes – Upper Mississippi River Board." Id., pp. 5-9; compare ECF No. 51-5.

During his deposition, Mr. Diamond testified that, although he attached the Standards to his report, he was unaware of whether the subject pool and/or waterslide violated any of the Standards. See Diamond Deposition Transcript ("Diamond Dep."), ECF No. 51-6, pp. 88-89. Mr. Diamond admitted at his deposition that he reviewed a single photograph of the subject pool prior to formulating his opinions and drafting his report, but did not: (1) speak or interview Plaintiff; (2) read Plaintiff's deposition transcript; (3) visit the resort or inspect the subject pool or waterslide; (4) read any other document produced in the litigation; (5) review pool- or waterslide-safety standards, statutes or codes applicable in Jamaica; or (6) review any engineering specifications, drawings or blueprints of the pool or waterslide. Id., pp. 40-42, 58-59, 61, 88-89.

Mr. Diamond further testified that he did not perform any testing or analysis to determine the force with which Plaintiff entered the pool via the waterslide, id., p. 119, and did not have enough information to determine whether Plaintiff was injured because the waterslide was allegedly defective, id., pp. 112-113, 120-121. Finally, with regard to the water level and pool depth, Mr. Diamond testified that he was unable to render an opinion on whether: (1) the water depth by the waterslide terminus was appropriate on the date of Plaintiff's injury; or (2) the pool depth was deep enough. Id., pp. 93, 115, 117-118.

## II.  DISCUSSION

### a.  Admissibility Of An Expert's Opinion Under Fed. R. Evid. 702

"The party seeking to introduce expert testimony 'bears the burden of establishing its admissibility by a preponderance of the evidence.'" Qube Films Ltd. v. Padell, 13 Civ. 8405 (AJN), 2016 U.S. Dist. LEXIS 25137, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003)).  Fed. R. Evid. 702 sets forth two prerequisites that must be satisfied before a witness is allowed to provide expert testimony. "First, the witness must be properly qualified as an expert to testify on scientific, technical, or specialized matters." Ramos v. SimplexGrinnell LP, 796 F. Supp. 2d 346, 373 (E.D.N.Y. 2011) (citing Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81-82 (2d Cir. 1997)). "Second, the court must determine whether the expert testimony is both relevant and reliable." Id. (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." The Supreme Court further explained in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999),

that the objective of the "gatekeeping" requirement of Daubert and Fed. R. Evid. 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." "The trial judge's gatekeeping obligation applies not only to testimony based on 'scientific' knowledge, as in Daubert, but also to testimony based on 'technical' or 'other specialized' knowledge." Zaremba v. GMC, 360 F.3d 355, 358 (2d Cir. 2004) (quoting Kumho Tire, 526 U.S. at 141).

In order to assess whether expert testimony is sufficiently reliable, the court engages in a flexible inquiry under which it may consider the following factors: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the known or potential rate of error and the existence of standards controlling the technique's operation; and (4) whether the theory or technique has gained general acceptance in the relevant scientific community. Daubert, 509 U.S. at 593-94; see Zaremba, 360 F.3d at 358. "A district court should consider the Daubert factors 'where they are reasonable measures of the reliability of expert testimony,' [but] the list of factors 'neither necessarily nor exclusively applies to all experts or in every case.'" Zaremba, 360 F.3d at 358 (quoting Kumho Tire, 526 U.S. at 141, 152); Qube Films, 2016 U.S. Dist. LEXIS 25137, at *4 (explaining that the Daubert factors "do not constitute a definitive checklist or test") (citing Kumho Tire, 526 U.S. at 150). Indeed, the trial court enjoys "the same kind of latitude in deciding how to test an expert's reliability . . . as it enjoys when it decides whether or not that expert's relevant testimony is reliable." Kumho Tire, 526 U.S. at 152 (emphasis in the original).

Even the most "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are

reliable and relevant under [Daubert]." McDowell . v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing Clark v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999)). "Though the weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'" Baker, 254 F. Supp. 2d at 353 (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)). "Moreover, the Supreme Court has emphasized, in addressing the distinction between methodology and conclusions, that 'nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" Id. (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

"In design defect cases, testing, although not an absolute prerequisite for expert testimony to be admissible, is usually critical to show that an expert adhered to the same standards of intellectual rigor that are demanded in their professional work." Karnauskas v. Columbia Sussex Corp., 09 Civ. 7104 (GBD), 2012 U.S. Dist. LEXIS 8988, at *24-25 (S.D.N.Y. Jan. 24, 2012) (internal quotations & alternations omitted). Indeed, "[c]ourts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested." Id. (citing Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000) (expert evidence excluded where expert did not test theory in defective motor-boat engine case); Oddi v. Ford Motor Co., 234 F.3d 136, 156-57 (3d Cir. 2000) (excluding expert evidence where engineer failed to design or test safer design for truck bumper); Peitzmeier v. Hennessy Indus., 97 F.3d 293, 298 (8th Cir. 1996) (excluding expert evidence of alternative design where expert did not design or test any proposed devices he claimed were missing from defendant's machine); American & Foreign Ins.

6

Co. v. General Electric Co., 45 F.3d 135, 139 (6th Cir. 1995) (rejecting expert evidence where expert lacked protocol for tests and took no notes during testing)). Although not a requirement, "[t]he failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony." Brooks, 234 F.3d at 91 (citing Daubert, 509 U.S. at 589).

      **b.**      **Analysis**

At the outset, it is helpful to note that, throughout the discovery period in this litigation, Plaintiff did not clearly indicate the theory of liability on which he intends to proceed. Plaintiff's Amended Complaint mentions various amorphous theories, see Amended Complaint, ECF No. 24-1 ¶ 18 (i.e., the waterslide was in a defective/dangerous condition; the water level was at an unreasonable level; Defendants failed to properly supervise the pool, provide warning signs, or remove a dangerous condition), but when pressed by the Court during the pendency of this litigation, see ECF No. 26, Plaintiff did not provide a coherent theory. Based upon Mr. Diamond's report, which asserts that "the water [wa]s too shallow," see Diamond Rep., ECF No. 51-4, p. 5, and Plaintiff's opposition to Defendants' Daubert motion, which asserts that Mr. Diamond would "opine that the depth of the pool present[ed] a danger to its users," see ECF No. 50, p. 4, Plaintiff now proceeds on the theory that the subject pool and/or waterslide was defectively designed.

      **i.**      **Qualifications**

Plaintiff's expert disclosures did not contain Mr. Diamond's curriculum vitae or an explanation of his qualifications as required by Fed. R. Civ. P. 26(a)(2)(B)(iv), but Mr. Diamond testified to his background at his deposition.

Mr. Diamond's highest level of education is high school,[1] and he is currently self-employed as the owner of a pool service company called "The Pool Lady," which conducts service, maintenance and renovations on residential and commercial pools. See Diamond Dep., ECF No. 51-6, pp. 5-7, 11-12. Prior to owning The Pool Lady, Mr. Diamond was a "partner" at a general construction company in Florida from 2000-2009 called "Gold Coast Construction Services." Id., pp. 18-19. Approximately 5% of the work completed by Mr. Diamond while at Gold Coast Construction Services pertained to pool construction repairs, none of which involved waterslides. Id., pp. 21-23. From 1990-2000, Mr. Diamond worked for The Pool Lady, which, at the time, was owned by his mother. Id. pp. 13-14.

Simply stated, Mr. Diamond lacks any relevant qualifications to serve as an expert witness on the propriety of the subject pool and/or waterslide design. The entirety of Mr. Diamond's experience in this area amounts to providing construction and maintenance pool services. During Mr. Diamond's 25-year career in the pool industry, he has never: (1) designed any structural specifications for pools; (2) designed any structural specifications for waterslides; or (3) approved any pool-design or pool-construction drawings. Id., pp. 18, 34, 123. At best, Mr. Diamond's qualifications are limited to physically building a pool, a different task than designing a pool or a waterslide, which, as Mr. Diamond acknowledged at his deposition, he—unlike engineers or architects—is unqualified to do. Id., p. 18.[2]

---

[1] Mr. Diamond did attend college for several semesters, but did not graduate. See Diamond Dep., ECF No. 51-6, pp. 6-7.

[2]   Q: Have you ever drawn any specifications for pools?
    A: Only by design, not by structure, not qualified to. I know what kind of steel [to use] and how much to put in. Typically, I would do more, a little bit more than the norm, but as far as the actual spec[ification]s, I leave that to the engineers.
    Q: And architects?
    A: Yes.

In sum, while Mr. Diamond may be entirely qualified to offer testimony on whether a particular pool or waterslide was built according to predetermined specifications—a topic not at issue in this litigation—he is not qualified to opine on whether the design specifications of the subject pool and/or waterslide (design specifications which, as described below, he did not review) were designed in accordance with applicable safety standards (applicable safety standards with which, as described below, he was unacquainted) or whether the alleged failure to abide by the applicable safety standards caused Plaintiff's injuries (about which, as described below, he affirmatively stated he has no opinion). Accordingly, Mr. Diamond is not qualified to offer testimony regarding the standard of care or breach thereof related to the subject pool or waterslide design, or the designs' alleged causation of Plaintiff's injuries. This precludes his testimony in its entirety.

### ii. Reliability/Relevance

As previously noted, there is no decisive list of factors to be considered when evaluating a Daubert motion. Daubert, 509 U.S. at 593-94. "Nevertheless, whether the theory can and has been tested, whether it has been subject to peer review, the technique's potential rate of error, and whether the technique has been 'generally accepted' in the relevant professional or academic community have all been identified as relevant considerations. Buchwald v. Renco Grp., 13 Civ. 7948 (AJN), 2015 U.S. Dist. LEXIS 110140, at *23 (S.D.N.Y. Aug. 19, 2015) (citing Daubert, 509 U.S. at 593-94; Kumho Tire, 526 U.S. at 147). Here, Mr. Diamond's proposed testimony falls dramatically short of the required standards of reliability as he cannot satisfy any of these four factors.

Plaintiff seeks to have Mr. Diamond testify that the subject pool and/or waterslide were improperly designed so as to prevent Plaintiff from safely entering the water via the waterslide.

In his report, Mr. Diamond provides opinions regarding the depth of the pool and the height of the water at the waterslide terminus,[3] which, in essence, is his "theory." See Daubert, 509 U.S. at 593-94. Yet, in support of his theory, he fails to provide any of the following: citations to applicable pool-design safety standards, citations to applicable waterslide-design safety standards, testing he conducted, science or engineering he consulted or utilized, methodology he used, or alternative pool and/or waterslide designs he created or reviewed. In other words, Mr. Diamond has not shown that his theory has been tested or subjected to peer review, whether the (non-existent) testing has been generally accepted by the relevant professional community or whether there is an identifiable rate of error. Along the same vein, Mr. Diamond's failure to provide an alternative pool and/or waterslide design, in and of itself, justifies the exclusion of Mr. Diamond's testimony. See Zaremba, 360 F.3d at 358. ("Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests.").

Moreover, even if Mr. Diamond had provided any of this information, conducted appropriate testing, or created alternative designs, there is no information in the record as to how he would have correctly done so given the lack of facts and data given to him. See Fed. R. Evid. 702(b) ("A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if . . . the testimony is based on sufficient facts or data."). According to Mr. Diamond, the only document he reviewed prior to offering his report was a single photograph of the "bottom section of the [water] slide." See Diamond Dep., ECF No. 51-6, p. 40. Mr. Diamond

---

[3] Mr. Diamond also includes in his expert report his belief that the subject pool is designed in a manner which would not allow it to be appropriately protected by a winterized covered, but such an assertion, even if correct, clearly has nothing to do with the issues in this litigation. See Diamond Dep., ECF No. 51-6, p. 48.

10

did not undertake his own investigation as he did not: (1) speak or interview Plaintiff; (2) read Plaintiff's deposition transcript; (3) visit the resort or inspect the subject pool or waterslide; (4) read any other document produced in the litigation; (5) review, or even claim to be aware of, pool- or waterslide-safety standards, statutes or codes applicable in Jamaica; or (6) review any engineering specifications, drawings or blueprints of the pool or waterslide. Id., pp. 40-42, 58-59, 61, 88-89. Some or all of this information would be necessary to any expert's proposed opinion on the propriety and safety of the subject pool and/or waterslide designs and whether the designs played a part in causing Plaintiff's injuries. Mr. Diamond made no effort to collect the underlying facts or data necessary to undertake a scientific and disciplined approach to proffering a bona fide expert opinion.[4]

In fact, Mr. Diamond candidly admitted that, without any of the necessary facts or data, he is unable opine on the depth of the subject pool, the water level of the subject pool or the cause of Plaintiff's injury:

> Q: You don't know the floor of this pool at Rose Hall because you never inspected or saw any spec[ification]s?
> A: That's correct.
> Q: This 3-foot 6-inch pool depth could be okay if the bottom of the pool was sloped accordingly?
> A: If it is sloped accordingly, that is possible.
> Q: Is it true that you couldn't render an opinion absolutely that this pool is not deep enough at 3 feet 6 inches because you don't know that other information?
> A: I don't believe anybody could, correct.
>
> * * * * * * * *
>
> Q: . . . You don't have any opinion as to whether Defendants failed to maintain the water depth by the slide terminus?
> A: No.

---

[4]  As discussed during several discovery conferences, see 7/17/2015 & 7/31/2015 Orders, Plaintiff's counsel did not undertake to obtain any pool- or waterslide-related information directly from Jamaica. Thus, the lack of any collection efforts may rest primarily with Plaintiff's counsel, rather than with Mr. Diamond.

> Q: You have no idea what the water depth was on the date that [Plaintiff] allegedly got hurt, correct?
> A: In actuality, no . . . .
>
> \* \* \* \* \* \* \* \*
>
> Q: With regard to Pierre Bruno, the plaintiff, you said you would need more information to determine why he was hurt?
> A: Yes.
> Q: Without more information, you don't have a theory, a scientific theory as to why he was hurt?
> A: If you are asking me to give a scientific anything off of a picture, it's impossible.
>
> \* \* \* \* \* \* \* \*
>
> Q: Is it fair to say that a synopsis of your opinion is that you didn't have enough information to determine whether the plaintiff was injured because this waterslide was unreasonably dangerous or defective in some way?
> A: That is correct.

See Diamond Dep., ECF No. 51-6, pp. 93, 112-113, 117, 120-121.

Simply stated, Mr. Diamond cannot assist the trier of fact where his opinions, whatever those opinions may be, amount to mere speculation as to whether an alternatively designed pool or waterslide would have led to a different result when Plaintiff used the subject pool and waterslide. Mr. Diamond's submissions lack any factual foundation that would demonstrate the reliability of his opinions; his opinions are conclusory and classic ipse dixit. See Baker, 254 F. Supp. 2d at 353. Moreover, Plaintiff cannot use Mr. Diamond to complete the factual record.

### III. CONCLUSION

In light of the foregoing, Defendants' motion to preclude the expert testimony of Mr. Diamond is **granted**. As previously Ordered by this Court, see ECF No. 55, Defendants' summary judgment motion must be served by April 22, 2016; Plaintiff's opposition must be served by May 13, 2016; Defendants' reply must be served by May 20, 2016; and the fully briefed motion must be filed by May 23, 2016.

Dated:  Brooklyn, New York
           March 28, 2016

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge